**Affirmed; Opinion Filed December 16, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-13-00674-CR

**ROLAND LASHUN JERNIGAN, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 195th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-11-59314-N**

## MEMORANDUM OPINION

Before Justices Bridges, Lang, and Evans
Opinion by Justice Lang

Following a plea of not guilty, appellant Roland Lashun Jernigan was convicted by a jury of burglary of a habitation. Additionally, appellant pleaded true to one enhancement paragraph and the jury found that enhancement paragraph true. Punishment was assessed by the jury at ten years' imprisonment.

In four issues on appeal, appellant contends the trial court erred by (1) not instructing the jury that an accomplice witness's testimony must be corroborated by other evidence and (2) improperly admitting into evidence certain video recordings and "GPS evidence." We decide against appellant on his four issues. The trial court's judgment is affirmed. Because all dispositive issues are settled in law, we issue this memorandum opinion. *See* TEX. R. APP. P. 47.2(a), 47.4.

# I. FACTUAL AND PROCEDURAL BACKGROUND

The indictment in this case alleged in part that on approximately August 15, 2011, appellant entered a habitation without the effective consent of the owner and committed theft. The record in this case involves a composite of accomplice testimony, law enforcement surveillance, convenience store observation videos, and "GPS"[1] tracking of vehicles. We describe the evidence in great detail in order to address, in part, whether the accomplice's testimony was corroborated.

At the start of trial, the trial court held a hearing outside the presence of the jury at appellant's request to consider the admissibility of evidence respecting a "GPS tracker" used by law enforcement officers in this case. During that hearing, Jeremy Chevallier, a property crimes detective with the Carrollton Police Department, stated that prior to the commission of the offense in question, he installed a "tracker" on a white Chevrolet Impala (the "suspect vehicle") that was suspected to have been used in several burglaries. The "tracker" was made by a company named "Covert Track." Chevallier testified he has used such "trackers" on many occasions. According to Chevallier, "[b]asically the GPS tracker . . . sends out a signal to a GPS satellite, and the satellite will position that GPS unit on a map," which is displayed on a "web-based tracking system."

The State offered State's Exhibit 1 as evidence at the hearing, which Chevallier described as a nineteen-page printout of a "GPS tracker report" respecting the suspect vehicle. According to Chevallier, State's Exhibit 1 showed "what the tracker was reading" on the date of the offense in question, including "all the streets and the times." Chevallier stated he has received training in the use the "GPS tracker" in question, including (1) watching "instructional information"

---

[1] The record shows "GPS" stands for "global positioning system."

provided with the device, (2) reading about the device, and (3) using the device on his own vehicle.

Defense counsel objected to State's Exhibit 1 on the ground that it constituted hearsay. The trial court overruled that objection. Then, in response to questioning by defense counsel, Chevallier testified he (1) knows "no more than a layman knows about a GPS," (2) had no involvement in the development of the device in question, (3) has no training as to the "inner workings" or algorithms of the device or how to "determine the liability [sic] of it," (4) has no specific knowledge of when the device used in this case was purchased or when it was last calibrated, and (5) has no specific expertise in "tracking" and has not published any "peer review articles" on that subject. Additionally, Chevallier testified (1) the data contained in State's Exhibit 1 was stored on Covert Track's "servers" from the time it was collected in 2011 until being printed out by him on the day before trial commenced and (2) he did not have "any care, custody, or control of that data."

At that point, defense counsel asserted an objection that the State had not "met the predicate" for the admission of evidence respecting the "tracker" device before the jury because Chevallier "is not an expert in this—with regard to this device." Defense counsel stated in part, "He may have the knowledge to use it, but he has no scientific knowledge or training with regard to how this device works. It would be very much similar to a breath test device, Your Honor, where the operator cannot testify as to the reliability and credibility of the device."

The State responded in part that "the information is not considered expert testimony" and Chevallier (1) is a "fact witness;" (2) "is explaining what is within the knowledge of every common person; any lay witness"; and (3) "has specialized training in interpreting the GPS tracker." Additionally, the State argued that under Texas law, "[a] person may lack experience

on how a piece of equipment operates but be qualified to interpret the data and equipment and the data it collects."

The trial court ruled that it "deems the testimony as well as the subject matter including evidence gained as a result of the GPS tracking device admissible." Then, the jury returned to the courtroom.

The complainant, Cathy Davis, testified she lives at 11220 Strait Lane in Dallas County. She stated that at 10:30 a.m. on August 15, 2011, she was at home getting dressed and heard "a really loud noise." She walked to the front of the house and saw the front door was open and the door frame was broken. She stated that her purse, which she had placed on a small chair by the front door earlier that morning, was gone. Her purse contained credit cards, her driver's license, some cash, and her phone. Davis called her husband and the police. She testified that when her husband arrived home a short time later, he noticed that several golf clubs he kept outside were missing. According to Davis, she learned one of her credit cards had been used "[p]retty quickly" to make a $150 gas purchase at a 7-Eleven store. On cross-examination, Davis testified she did not see an individual in her house or a car at her house at the time of the events she described.

Sergeant Jack Adams of the Carrollton Police Department testified that on the date of the events in question, he was "doing surveillance" on the suspect vehicle described above as part of a burglary investigation. He stated several officers in an unmarked "command vehicle" were using a laptop computer to track the movements of the suspect vehicle. Simultaneously, the command vehicle and several other unmarked police cars, including one driven by Adams, were covertly following the suspect vehicle. According to Adams, officers in the command vehicle told him the suspect vehicle had parked on Strait Lane for several minutes and then left. Adams testified that at that point, he was parked on a side street near Strait Lane. He stated that as the

suspect vehicle drove by his location on the side street, he "was able to look in the car and see [appellant]." According to Adams, appellant was driving the suspect vehicle. Adams stated there was also a passenger in the suspect vehicle.

Detective Jack Perritt of the Carrollton Police Department testified he was part of the burglary investigation described above. He stated he was in a vehicle on a street that intersected with Strait Lane and saw the suspect vehicle "entering" Strait Lane. According to Perritt, there were two black males inside the suspect vehicle. Perritt testified he "left the neighborhood" and waited on a "main road" nearby. He stated that subsequently, the suspect vehicle pulled up next to him at a red light and he looked inside the suspect vehicle to see if he could identify the driver. According to Perritt, the driver of the suspect vehicle was appellant.

Chevallier testified he was involved in the same burglary investigation described above. According to Chevallier, he was using a laptop computer to view the location of the suspect vehicle on a satellite map while simultaneously riding in the command vehicle that was physically following the suspect vehicle. Chevallier stated in part, "We don't just rely on the tracker itself and the data that we collect. We like to see who is in the vehicle, make sure it's the vehicle that we have the tracker on."

Chevallier stated he recognized State's Exhibit 1 as a "raw data report" he had "pulled up yesterday." He stated the report showed the location of the suspect vehicle on the date in question from about 10:20 a.m. until "the next afternoon." The State introduced State's Exhibit 1 into evidence. Defense counsel stated, "No objection," and State's Exhibit 1 was admitted into evidence.

Chevallier testified he saw the suspect vehicle enter the neighborhood around Strait Lane, then later saw the suspect vehicle again as it left the neighborhood. According to Chevallier, there appeared to be two black male occupants. After the suspect vehicle left the Strait Lane

neighborhood, Chevallier and the surveillance team followed it to a 7-Eleven convenience store in Dallas "at Skillman/Audelia." Chevallier stated "at no point did we ever lose sight of the car on [sic] the tracker or individually."

According to Chevallier, the suspect vehicle arrived at the 7-Eleven store around noon. Chevallier stated he and his partner "set up" across the street from the 7-Eleven and he watched the area outside the store through a pair of binoculars. He testified he was able to identify the driver of the suspect vehicle as appellant and the passenger as Demontric Lockridge. Chevallier stated appellant and Lockridge appeared to purchase gas for several vehicles that "came in through the line." According to Chevallier, appellant was "at the pump that all the cars went to and filled up like he was being the attendant." Also, Chevellier testified, appellant went inside the store. Chevallier stated that one of the officers on the surveillance team went into the 7-Eleven and learned that the credit card used for the gas purchase belonged to "someone named Cathy Davis." Chevallier stated he obtained an address for Davis and went to her residence on Strait Lane. He testified that at point he learned of the burglary at Davis's residence.

On cross-examination, Chevallier testified State's Exhibit 1 showed the suspect vehicle arrived in the Strait Lane area at approximately 10:37 a.m. on the date in question and stopped for slightly more than one minute on Strait Lane at approximately 11 a.m. Chevallier stated (1) he was not "in actual contact" with the suspect vehicle at the time it stopped on Strait Lane and (2) he and the other officers on the surveillance team did not see anyone from the suspect vehicle enter a house. Additionally, the following exchange occurred between Chevallier and defense counsel on cross-examination:

> Q. . . . All the events that are registered in that State's Exhibit Number 1, you would testify that those events are accurate as to all the information contained therein.
>
> A. I would have to say based on what I saw on that day that the tracker was working properly. Yes, sir.

Q. Now, let's talk a little bit about what you saw and what you've come to see. Basically, as the tracker indicates, it's fair to say that their vehicle entered the Strait Lane street or area approximately around 11 o'clock, is that correct—or at 11 o'clock if we believe that the tracker is accurate.

A. At that time, yes.
. . . .
Q. Basically on page 9 of 19, it's indicating that this is the data where the vehicle entered Strait Lane; is that correct?

A. Correct.

Q. And I think the first notice or first documentation of him entering Strait Lane was at 11 a.m.—straight up 11. Is that correct?

A. Yes.

Alex Gelan testified he owns a 7-Eleven franchise at 9230 Skillman. The store has video surveillance cameras. Gelan testified he provided law enforcement officers with copies of video surveillance recordings from those cameras. The State showed Gelan State's Exhibit 3 and State's Exhibit 4 and asked him whether those exhibits were "copies from your video surveillance system." Gelan stated in part, "The one I said, yes." Then, the State offered into evidence State's Exhibit 3 and 4. Defense counsel objected and stated, "We don't believe the proper predicate has been laid as to the authenticity of these videos and the veracity of them being true and correct." The trial court overruled that objection and admitted State's Exhibits 3 and 4 into evidence.

On cross-examination, Gelan testified he is not sure whether he was at the store on the date in question. Additionally, he stated, "I see the video. I don't know what is on there."

Officer James Burson of the Carrollton Police Department testified he participated in the burglary investigation described above. He stated he and another officer were in a police vehicle. He saw the suspect vehicle pull into the area in front of the 7-Eleven store on Skillman and he watched the suspect vehicle from a nearby parking lot. He stated he saw the suspect

vehicle "meet up with a couple of other vehicles." Then, he testified, he saw the driver of the suspect vehicle go inside the store. Burson stated that person was appellant.

Burson testified appellant was inside the store for approximately five minutes, then "drove over to the gas pumps, Gas Pump Number 11, and joined the other two vehicles and filled up with gas." According to Burson, "all of that was captured on video." Burson stated that after the suspect vehicle left the area, he went inside the 7-Eleven store and asked the manager for a copy of the receipt for the gas purchase on pump number eleven so he could "see which credit card they used and to whom that credit card belonged." He stated he learned the credit card used for the gas purchase belonged to Davis. He testified he was not able to get the store's video surveillance footage at that time because the clerk at the 7-Eleven "did not know how to work the system." Burson stated he later returned to the store and obtained copies of the video surveillance footage. He testified State's Exhibits 3 and 4 "fairly and accurately" depict what he saw happen at the 7-Eleven.

At that point, State's Exhibits 3 and 4 were published for the jury. Neither recording contained audio. Burson testified (1) State's Exhibit 3 showed appellant making a cash purchase inside the 7-Eleven store at approximately 12:10 p.m. on the date in question and (2) State's Exhibit 4 showed the suspect vehicle and the two vehicles Burson had seen "meet up" with the suspect vehicle receiving gas from pump number eleven at approximately 12:14 p.m. on the same date. According to Burson, the first vehicle to receive gas was a gray Ford Taurus. Burson stated (1) a woman exited the Taurus at pump number eleven, swiped a credit card at the pump, and began pumping gas into the Taurus and (2) another person exited the Taurus and pumped gas from the same pump into the second car and the suspect vehicle.

On cross-examination, Burson stated appellant did not use a credit card inside the store. Further, Burson testified he did not see appellant (1) give anything to the woman in the Taurus or (2) "personally input a credit card into any gas pump."

Then, the State recalled Chevallier as a witness. Chevallier testified that upon arriving at the 7-Eleven store on the date in question, the suspect vehicle did not go directly to the gas pumps, but rather parked outside the store first. Chevallier stated he saw appellant and Lockridge (1) talk with the occupants of a silver Taurus and (2) get into the Taurus for a short time while it was parked outside the 7-Eleven. According to Chevallier, the vehicles described above then moved to gas pump number eleven and appellant stood near the pump during the entire time the vehicles were being filled with gas.

Demontric Lockridge testified he has known appellant for several years. Lockridge stated that on the date in question, he was in possession of the suspect vehicle and he and appellant decided to commit a burglary. According to Lockridge, appellant drove the suspect vehicle and selected the Strait Lane neighborhood. Lockridge rode in the passenger seat. Lockridge stated that after they got to Strait Lane and "found the house," they "knocked at the door and the door was open." Lockridge testified both he and appellant entered the house. He stated they took "[j]ust a purse that was sitting on a little ol' stool." Then, he stated, they went to a 7-Eleven on Skillman "[t]o purchase some stuff and sell some gas." Lockridge testified selling gas involves collecting cash from buyers for gas purchased with a credit card. He stated the buyers receive "discounts" from the retail price of the gas. According to Lockridge, he and appellant filled up two or three vehicles with gas at the 7-Eleven and planned to split the proceeds equally. Lockridge stated he was not charged with any crime in this case. He testified he has been convicted of numerous other crimes and is currently serving a 15-year sentence in

the penitentiary. On cross-examination, Lockridge testified he and appellant committed only one burglary together and that burglary was not in Dallas County, but rather was in Denton County.

Officer Jay Lopez of the Dallas Police Department testified that on August 16, 2011, he and his partner were on routine patrol and saw a car with an expired vehicle registration near Kiest and Lancaster in Dallas. Lopez and his partner decided to "do a traffic stop." According to Lopez, after they "lit him up," the car turned west onto Oakland. Lopez testified that at that point, he saw the person in the front passenger seat of car "reach his hand outside the window and drop some items onto the ground." Lopez stated the car continued "rolling" for about ten or fifteen feet, then came to a stop. According to Lopez, the passenger who dropped the items from the car was appellant.

Lopez testified that after he and his partner identified the occupants of the car, he went to the spot where he had seen the items being dropped and found "a bunch of credit cards and a Texas driver's license." Lopez identified State's Exhibit 9 as the property he found on the ground. State's Exhibit 9 consisted of a driver's license for "Cathy Davis," nine credit cards in Davis's name, and an insurance card in the name of "William Davis." Lopez stated appellant was not arrested at that time.

The charge of the court stated in part "a person commits the offense of burglary of a habitation if, without the effective consent of the owner, he intentionally or knowingly . . . enters a habitation and commits or attempts to commit theft." Additionally, the charge stated in part (1) "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both" and (2) "[a] person is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense."

–10–

During closing, defense counsel argued in part, "And what you must do before you find the defendant guilty, you must believe beyond a reasonable doubt that the evidence that they have brought you proves that [appellant], either himself or as a party, entered that house on Strait Lane; Ms. Cathy Davis' house." Additionally, defense counsel (1) asked the jury to "look at the details" of the GPS tracking report and (2) argued that the tracking report showed the suspect vehicle "was not on Strait Lane until after 11 o'clock."

The jury found appellant guilty and assessed punishment as described above. Appellant filed a motion for new trial, which was overruled by the trial court. This appeal timely followed.

## II. JURY CHARGE ERROR

### A. Standard of Review

Appellate review of alleged jury charge error generally involves a two-step process. *See Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). First, we must determine whether error occurred. *See Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). If there is error in the charge, we must then analyze whether sufficient harm resulted from the error to require reversal. *Id.* Under this second step, the degree of harm necessary for reversal generally depends on whether the appellant properly preserved the error by objection. *See Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013); *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).

If the appellant did not object, we will reverse only if there is "egregious harm." *Reeves*, 420 S.W.3d at 816; *Ngo*, 175 S.W.3d at 743–44. Errors that meet the "high and difficult standard" of causing egregious harm are those that "affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory." *Ngo*, 175 S.W.3d at 750 (quotations omitted); *accord Reeves*, 420 S.W.3d at 816; *see also* TEX. CODE CRIM. PROC. ANN.

–11–

art. 36.19 (West 2006). This standard requires the reviewing court to find that the appellant suffered some actual, rather than merely theoretical, harm from the error. *See Reeves*, 420 S.W.3d at 816. We consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim. App. 2011) (quoting *Almanza*, 686 S.W.2d at 171). In analyzing harm from a jury charge error, neither the State nor the defense has a burden to show harm. *Reeves*, 420 S.W.3d at 816.

### B. Applicable Law

The Texas Penal Code provides in part that a person commits burglary of a habitation if, without the effective consent of the owner, he enters a habitation and commits theft. *See* TEX. PENAL CODE ANN. § 30.02(a) (West 2011). A person commits theft if he unlawfully appropriates property with intent to deprive the owner of the property. *Id*. § 31.03(a). Further, pursuant to the penal code, a person is criminally responsible as a party to an offense "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *See id*. § 7.01(a). A person is criminally responsible for the conduct of another if, acting "with intent to promote or assist the commission of the offense," he "solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id*. § 7.02.

Article 38.14 of the Texas Code of Criminal Procedure provides "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005); *see Zamora v. State*, 411 S.W.3d 504, 509 (Tex. Crim. App. 2013); *see also Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007) ("This accomplice witness rule creates a

statutorily imposed review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards."). To satisfy article 38.14, "'the evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense.'" *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009) (quoting *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008)).

To meet the requirements of article 38.14, the corroborating evidence "need not prove the defendant's guilt beyond a reasonable doubt by itself." *Malone*, 253 S.W.3d at 257. "Nor must the non-accomplice evidence directly link the accused to the commission of the offense." *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). Further, "circumstances that are apparently insignificant may constitute sufficient evidence of corroboration." *Malone*, 253 S.W.2d at 257. While a defendant's mere presence at the crime scene is insufficient to corroborate accomplice testimony, "'[p]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction.'" *Id*. (quoting *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984)).

The trial court has a duty to sua sponte instruct the jury on accomplice-witness testimony when the evidence raises the issue. *See Zamora*, 411 S.W.3d at 512–13 & 512 n.4. A witness is an accomplice as a matter of law when the witness has been charged with the same offense as the defendant or a lesser-included offense or "when the evidence clearly shows that the witness could have been so charged." *Id*. at 510. "Under the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for

conviction clearly and significantly less persuasive.'" *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

### C. Application of Law to Facts

In his first issue, appellant contends the trial court's failure to include an instruction in the jury charge requiring the corroboration of accomplice testimony was "egregious error."[2] Specifically, appellant argues (1) "Lockridge, the accomplice in the burglary of Davis's home, testified as a State's witness"; (2) "without a proper jury instruction, the jury did not know that Lockridge's testimony must be corroborated before it could convict Appellant of the charged offense"; and (3) "Lockridge's testimony was the only evidence that placed Appellant inside Davis's home, an essential element of the charged offense." Further, according to appellant, "the failure to include this important instruction in the jury charged denied Appellant his right to a fair trial" because "[w]ithout the accomplice witness instruction, there was no safeguard to ensure that the jury did not convict Appellant on Lockridge's testimony alone."

The State responds in part that any such error "could not have created any unfairness" and therefore did not egregiously harm appellant. The State argues that the evidence affirmatively corroborating Lockridge's account included (1) the presence of the suspect vehicle, occupied by appellant and another male, near the site of the burglary at the time of the burglary, (2) appellant's "quick use of the stolen credit card to purchase gasoline for multiple vehicles at a nearby filling station," and (3) appellant's possession of items belonging to Davis on the following day and his attempt to conceal that property as he was being stopped by a police officer.

The record shows law enforcement officers testified (1) they saw the suspect vehicle in the area near Strait Lane at approximately the time of the burglary of Davis's home and (2)

---

[2] Appellant acknowledges in his brief in this Court that he did not object to the charge.

appellant was driving the suspect vehicle and was accompanied by a male passenger. Additionally, the record shows (1) shortly thereafter, a credit card belonging to Davis was used to purchase gas for several vehicles at a 7-Eleven store; (2) appellant spoke with the occupants of one of those vehicles at the 7-Eleven prior to the gas purchase, briefly got inside that vehicle, and stood near the pump from which the vehicles were receiving gas; and (3) on the following day, appellant dropped items from the window of a vehicle as it was stopped by police and the items found on the ground at that spot included Davis's credit cards and driver's license.

On this record, we conclude rational jurors could have found that the non-accomplice evidence described above "tended to connect the accused" to commission of the offense in question. *See Malone*, 253 S.W.2d at 257; *Simmons*, 282 S.W.3d at 508. Further, we conclude such non-accomplice evidence is not "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Herron*, 86 S.W.3d at 632. Therefore, we conclude appellant was not egregiously harmed by any error by the trial court in not including a jury instruction respecting corroboration of accomplice testimony. *See id.*

We decide against appellant on his first issue.

### III. APPELLANT'S EVIDENTIARY COMPLAINTS

#### *A. Standard of Review*

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *See, e.g., Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). The trial court's ruling will be upheld if it is within the zone of reasonable disagreement and is correct under any theory of law applicable to the case. *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008); *Winegarner*, 235 S.W.3d at 790.

## B. Analysis

### 1. Surveillance Videos

In his second issue, appellant contends the trial court erred by admitting into evidence the video recordings designated as State's Exhibit 3 and State's Exhibit 4 because "the proper predicate had not been established" at the time those video recordings were admitted into evidence. Specifically, appellant asserts (1) the video recordings in question were admitted into evidence at the conclusion of Gelan's direct examination and (2) "Gelan did not testify that the videotapes accurately represented the events of August 15, 2011, at his store."

The State responds in part that the video recordings were properly admitted because (1) Gelan "identified them as part of the records of his business that he personally obtained for law enforcement" and (2) "the videos were effectively identified as a valid depiction of the activities at the 7-Eleven by Officers Chevallier and Burson."

"A bedrock condition of admissibility of evidence in any legal contest is its relevance to an issue in the case—that is to say, its tendency to make a fact of consequence to determination of the action more or less probable." *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). "Evidence has no relevance if it is not authentically what its proponent claims it to be." *Id*. As stated by the Texas Court of Criminal Appeals, rule 901(a) of the Texas Rules of Evidence "defines authentication as a 'condition precedent' to admissibility of evidence that requires the proponent to make a threshold showing that would be 'sufficient to support a finding that the matter in question is what its proponent claims.'" *Id*. (citing TEX. R. EVID. 901(a)). Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge. *Id*.; *see* TEX. R. EVID. 901(b)(1) (testimony by a "witness with knowledge" that "a matter is what it is claimed to be" can satisfy authentication requirement of rule 901). For example, a witness who observed the events depicted in a video recording may

lay the predicate respecting that video by testifying the video is an accurate representation of the object or scene in question. *See Standmire v. State*, No. 10-13-00282-CR, 2014 WL 3882940, at *6 (Tex. App.—Waco Aug. 7, 2014, pet. ref'd); *see also Huffman v. State*, 746 S.W.2d 212, 222 (Tex. Crim. App. 1988). "The trial judge does not abuse his or her discretion in admitting evidence where he or she reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified." *Druery*, 225 S.W.3d at 502. Further, "[e]vidence prematurely admitted in error may become admissible or be rendered harmless by subsequent evidence." *James v. State*, 102 S.W.3d 162, 175 (Tex. App.—Fort Worth 2003, pet. ref'd); *accord Davis v. State* 687 S.W.2d 78, 82 (Tex. App.—Dallas 1985, pet. ref'd) (any error in admitting photograph into evidence without proper authentication was "cured" when witness later testified she was present when photograph was taken); *Romo v. State*, 700 S.W.2d 633, 634 (Tex. App.—Houston [14th Dist.] 1985, no pet.) ("A conviction will not be reversed for error in receiving evidence that was not admissible when received but which became admissible at a subsequent stage.").

In the case before us, even assuming without deciding that Gelan's testimony did not constitute proper authentication as to State's Exhibits 3 and 4, the record shows that subsequent to the admission of those exhibits into evidence, Burson testified those exhibits "fairly and accurately" depicted what he saw happen at the 7-Eleven. Therefore, on this record, we conclude the trial court's admission of State's Exhibits 3 and 4 into evidence did not constitute reversible error. *See Davis,* 687 S.W.2d at 82; *James,* 102 S.W.3d at 175; *Romo*, 700 S.W.2d at 634; *see also Standmire*, 2014 WL 3882940, at *6.

## 2. GPS Evidence

### a. GPS Tracking Report

–17–

Next, we address appellant's fourth issue, in which he asserts the trial court abused its discretion by admitting State's Exhibit 1, the GPS tracking report, into evidence because (1) the report constitutes hearsay and (2) even if the report is not hearsay, the record does not "demonstrate the accuracy of the process that generated the report."

Texas case law "makes it clear that a statement of 'no objection' when the complained-of evidence is eventually proffered at trial—at least, without more—will signal to the trial court an unambiguous intent to abandon the claim of error that was earlier preserved for appeal." *Thomas v. State*, 408 S.W.3d 877, 885 (Tex. Crim. App. 2013). "[A]s with error preservation in general, the rule that a later statement of 'no objection' will forfeit earlier-preserved error is context-dependent." *Id*. "By that we mean that an appellate court should not focus exclusively on the statement itself, in isolation, but should consider it in the context of the entirety of the record." *Id*. "If the record as a whole plainly demonstrates that the defendant did not intend, nor did the trial court construe, his 'no objection' statement to constitute an abandonment of a claim of error that he had earlier preserved for appeal, then the appellate court should not regard the claim as 'waived,' but should resolve it on the merits." *Id*. "On the other hand, if from the record as a whole the appellate court simply cannot tell whether an abandonment was intended or understood, then, consistent with prior case law, it should regard the 'no objection' statement to be a waiver of the earlier-preserved error." *Id*. "Under the latter circumstances, the affirmative 'no objection' statement will, by itself, serve as an unequivocal indication that a waiver was both intended and understood." *Id*. at 885–86.

As to appellant's complaint respecting "accuracy of the process that generated the report," the record does not show that complaint was asserted in the trial court. Therefore, that complaint presents nothing for this Court's review. *See* TEX. R. APP. P. 33.1(a)(1) (to preserve complaint for appellate review, defendant must make timely and specific objection in trial court);

–18–

*see also Bekendam v. State*, 441 S.W.3d 295, 299–300 (Tex. Crim. App. 2014) (complaint on appeal must comport with objection made at trial); *Crouse v. State*, 441 S.W.3d 508, 516 (Tex. App.—Dallas 2014, no pet.) (same).

Further, the record shows defense counsel objected to State's Exhibit 1 during the pretrial hearing outside the jury's presence on the grounds that (1) the exhibit is hearsay and (2) the State had offered no expert testimony as to the "reliability and credibility" of the GPS device. However, (1) when State's Exhibit 1 was offered into evidence before the jury during trial, defense counsel stated, "No objection"; (2) subsequently, during cross-examination of Chevallier, defense counsel asked questions based on the data in that exhibit; and (3) during closing argument, defense counsel urged the jury that the "details" of that exhibit should be considered by them in support of appellant's argument.

Our review of the entire record reveals nothing contradicting appellant's apparent intention to fully relinquish his challenge to State's Exhibit 1. Because defense counsel specifically stated that he had no objection to the admission of the evidence in question and the record does not plainly indicate an intention not to abandon the previous claim of error, we conclude appellant's complaint respecting the inadmissibility of the tracking report has not been preserved for appellate review. *See Thomas*, 408 S.W.3d 877, 885–86; *Harper v. State*, 443 S.W.3d 496, 498–99 (Tex. App.—Texarkana 2014, no pet.).

We decide appellant's fourth issue against him.

### b. Testimony of Chevallier

In his third issue, appellant contends "[t]he trial court abused its discretion when it permitted a police officer to testify about GPS evidence because the State did not satisfy the proper predicate." Specifically, appellant contends Chevallier's testimony respecting use of a "GPS tracker" device is "scientific evidence" and the State thus had the burden to establish the

reliability of that evidence. According to appellant, the State did not do so and the evidence in question was therefore inadmissible. Further, appellant contends the evidence in question was "critical to the State's case" because "[a]lthough Chevallier testified that he and other officers followed the suspect vehicle with the tracker device, none of the officers who followed the car observed Appellant or the suspect vehicle near Davis's home on the offense date."

The State responds in part that there was "no need for the State to provide proof of the scientific theory upon which the GPS tracking device relied or of its precision or accuracy" because "Chevallier's testimony was merely offered to explain how the police came to observe [appellant's] vehicle in the vicinity of the Davis residence near the time of the burglary or as proof of a circumstantial fact."

Texas Rule of Evidence 702 provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. "When the subject of an expert's testimony is 'scientific knowledge,' then the basis of that testimony must be grounded in the accepted methods and procedures of science." *Morris v. State*, 361 S.W.3d 649, 654 (Tex. Crim. App. 2011). "For expert testimony based upon 'hard' science, we employ the *Kelly* test for reliability: (1) the underlying scientific theory must be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question." *Id.* (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)).

"It is only when the fact-finder may not fully understand the evidence or be able to determine the fact in issue without the assistance of someone with specialized knowledge that a witness must be qualified as an expert." *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002). If a witness is not testifying as an expert, "the witness' testimony in the form of opinions

or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." TEX. R. EVID. 701.

In the case before us, Chevallier testified he used the "GPS tracker" device to view the location of the suspect vehicle on a map on a laptop computer while at the same time riding in a vehicle that was following the suspect vehicle. Chevallier stated he saw the suspect vehicle enter and exit the neighborhood around Strait Lane near the time of the burglary in question. Additionally, (1) Perritt testified he saw the suspect vehicle entering Strait Lane and (2) both Adams and Perritt testified appellant was the driver of the suspect vehicle. Chevallier's testimony in question merely described the "GPS tracker" device as one of several methods being used by law enforcement officers to determine the location of the suspect vehicle. On this record, we conclude Chevallier's testimony in question was not scientific evidence. *See Morris*, 361 S.W.3d at 655 n.28; *cf. Ewing v. State*, No. 06-13-00089-CR, 2013 WL 5948108, at *5–6 (Tex. App.—Texarkana Nov. 5, 2013, no pet.) (mem. op., not designated for publication) (GPS testimony offered to show how police officers established location of stolen truck was not scientific evidence for which scientific foundation was required). Therefore, no scientific foundation was necessary. *See Osbourn*, 92 S.W.3d at 537.

We decide appellant's third issue against him.

### IV. CONCLUSION

We decide against appellant on his four issues. The trial court's judgment is affirmed.

/ Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
130674F.U05

–21–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ROLAND LASHUN JERNIGAN, Appellant

No. 05-13-00674-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-11-59314-N.
Opinion delivered by Justice Lang, Justices Bridges and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 16th day of December, 2014.