**Affirm and Opinion Filed March 27, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00863-CR

**LAWRENCE FRANK CROUSE, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Court at Law No. 2**
**Collin County, Texas**
**Trial Court Cause No. 002-87861-2011**

## OPINION

Before Justices FitzGerald, Francis, and Myers
Opinion by Justice FitzGerald

In a trial before the court, appellant was convicted of driving while intoxicated and sentenced to thirty days in jail, suspended for eighteen months, and a $50 fine. In five issues on appeal, appellant contends the evidence is insufficient to support his conviction and the trial court erred in admitting evidence that was procured through an illegal search and seizure and not properly authenticated. Concluding appellant's arguments are without merit, we affirm the trial court's judgment.

### Sufficiency of the Evidence

In his fourth and fifth issues, appellant challenges the sufficiency of the evidence to support his conviction. Specifically, appellant contends there was insufficient evidence to establish the reason appellant was intoxicated or that he was intoxicated in a public place.

At 1:30 a.m. on May 4, 2011, officers George White and Jennifer Larue spotted appellant's red Toyota sitting in a field with the lights on. Appellant began to drive around in a circle, as if he did not know where he was going. The car then left the field and continued into a parking lot for an industrial building. There were eighteen-wheelers and other work vehicles parked in the parking lot. The officers turned on their lights to initiate a traffic stop, but appellant's car continued through another portion of the field and onto a gravel road leading to the highway. Officer White pulled the police car in front of appellant's car to block his path. Although it was not raining, appellant had his windshield wipers on, as well as, his turn signal.

The officers questioned appellant about where he lived and where he was coming from. Appellant seemed confused, disoriented, and unaware of where he was. When the officer asked what date it was, appellant responded May 16th, not the true date of May 4th. Officer White described appellant's speech as slurred and thick-tongued. Appellant fidgeted, his pupils were dilated, and he would not make eye contact with the officers. Every time the officers asked appellant a question, he would look off in a different direction. Although the officers did not smell alcohol, Officer Larue thought appellant appeared to be "on something." Appellant had a difficult time balancing when he walked around the vehicle, and he leaned up against the vehicle with his body at a slant while he was answering the officers' questions.

Appellant identified himself as "Junior Crouse" and told the officers he did not have his driver's license with him. He first claimed he had an Ohio driver's license and then one from Texas. The officers could not verify either license. Appellant was wearing a hospital band on his wrist bearing the name "Lawrence Frank Crouse." He told the officers that a guy told him to go into the field, but no one else was around. Appellant also told the officers he was a registered nurse and was coming from Dallas after getting some gas.

The officers found some medical release papers on the front seat of appellant's car. When they asked appellant about the papers, he responded that he had been in the hospital that day for chronic back pain and had daily checks for depression. The release papers listed all of appellant's medications, and they all had warnings about the possibility of dizziness that could affect operating a motor vehicle or dangerous equipment. Specifically, the discharge summary showed that the medications prescribed included Flexoril, a muscle relaxant, and Vicodin, a pain medication. Both medications included the warnings: "DO NOT DRIVE, ride a bicycle or operate heavy machinery until you know how it will affect you," and "May cause drowsiness when taken with alcohol, muscle relaxant, sedative or pain medication. Use with caution." Concerned appellant had some mental health issues, the officers unsuccessfully attempted to contact his mother at the address listed on the insurance papers.

Officer Larue administered the standardized field sobriety tests. During the HGN test, appellant's eyes would not follow Officer Larue's pen, he moved his head, and he swayed back and forth. Officer Larue observed six clues, indicating intoxication. Officer Larue testified alcohol and narcotics cause HGN. During the walk-and-turn test, appellant missed the heel-to-toe position, raised his arms more than six inches, stepped off the line, turned improperly, and took ten steps instead of the nine he was instructed to take. The officer observed six clues, indicating intoxication. The officer also stated that during the testing process appellant tried to walk away several times. Appellant told the officer that he had leg weakness from his back surgery. Before taking the one-leg stand test, appellant told Officer Larue that he could not do a one-leg stand "on a good day" but would try the test anyway. During the test, appellant swayed, put his foot down, and did not count as instructed. Officer Larue observed three clues, indicating intoxication. Based on her observations, Officer Larue arrested appellant for public intoxication. When Officer Larue called her sergeant, he told her to charge appellant with DWI and ask for a

blood test. The officer further testified that at one point, appellant was so off balance that Officer Larue had to grab his handcuffs to prevent him from falling down.

Appellant agreed to provide a blood specimen. His blood was drawn at a hospital. The lab results showed the following drugs in appellant's system: Alprazolam, 0.006 milligrams per liter; Lorazepam 0.02 milligrams per liter; Cyclobenzaprine (no quantification performed); and Mirtazapine (no quantification performed).

Both officers testified appellant did not have normal use of his mental and physical faculties. The record also contains the videotape showing the traffic stop and testing process and appellant's medical records and discharge summary.

Appellant testified he had been diagnosed with "Bipolar I with rapid cycling" and saw a psychiatrist and counselor every month. Appellant explained that he went to the doctor for severe back pain at around 5:00 p.m. the day before he was stopped. Just after 8:00 p.m., he received intravenous morphine. He was discharged approximately two hours and twenty minutes later. The hospital records indicated appellant was discharged with a family member, but appellant claimed he drove himself. He remembered driving away, having a horrible headache, opening his door to vomit, and an officer pounding on his window with a flashlight. He was so disoriented, scared, and confused that he did not understand what the officers were asking him. He told Officer Larue that he had taken Depakote, a mood stabilizer, early the day before, that he had leg problems, and that the tumor surgery on his back had a significant effect on his ability to stand and walk due to chronic numbness and weakness from his mid thigh down. According to appellant, there was no way he could perform the tests correctly, but he tried the tests to be cooperative. He also claimed he had taken his bipolar medications regularly for years and had never been told not to drive or had his ability to drive affected. However, he missed his evening doses of Depakote and Remeron (sleep aid/antidepressant) the day he was stopped and believed

it was possible for his ability to drive to be affected by the missed doses. Appellant further testified that he was currently taking medication for a seizure disorder. Appellant admitted he had never experienced such an event before and claimed his current condition must have been caused by his first seizure, which he believed occurred when he was stopped by the officers. Appellant had no memory of events between the time he claimed he left the hospital and the time he was stopped by police at around 1:00 a.m. Appellant admitted his bipolar condition did not cause intoxication and thus played no part in this case.

During his testimony, appellant referred to Defendant's Exhibit 2, which was an email from Collin County Medical Examiner Dr. William Rohr. In the email, Rohr stated that he could not give a medical opinion that the combination of Lorazepam and Alprazolam in appellant's blood would cause a "loss" of the normal use of mental and physical faculties when the level of Lorazepam in appellant's blood was at a therapeutic level and the level of Alprazolam was subtherapeutic.

A defense expert witness, Dr. Virginia Neal, testified she was a psychologist and registered nurse. She reviewed the State's information, police records, the DPS toxicology report, appellant's counseling records, and the email from Rohr. She did not interview appellant or his family, did not make the bipolar disorder diagnosis, and did not view the video. According to Neal, the combination, timing, and level of medications appellant had taken the day of the stop would not cause appellant to not have the normal use of his mental or physical faculties. She opined appellant was not intoxicated. She acknowledged several of the drugs were not quantified, that is, measured in the lab report. There were no opiates in appellant's toxicology screen, and probably only traces of morphine would have remained in his system by the time his blood was drawn. She acknowledged the warnings associated with the use of morphine—not to operate machinery or drive a car when taking the medication. She agreed that the morphine drip

(approximately four milligrams) was strong because on a scale of 0 to 10, it reduced his pain from 9 out of 10 at admission to 0 out of 10 when discharged. She also testified the morphine could have affected appellant, but she did not know whether the prescription medications also affected him.

Neal further testified the Depakote and Neurontin that appellant took the morning before the test could have caused nystagmus and negatively affected his performance on the HGN portion of the field sobriety test. His inability to keep his balance and walk a straight line for the heel-to-toe and walk-and-turn tests could have been caused by numbness and weakness in his leg from his spinal tumor surgery. Appellant might have had a seizure the day he was stopped because his doctor was transitioning him from Xanax, which is a fast-acting benzodiazepine, to Alprazolam, a slower one, or because he missed doses of his medications. A person waking up from a seizure might experience fatigue, confusion, difficulty with gross motor skills such as walking, dilated pupils, flushing, retrograde amnesia, and thick-tongued speech. The symptoms observed by the officers could have been caused by appellant coming out of a seizure, which can mimic intoxication. And bipolar patients are susceptible to seizures.

When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.).

A person commits the offense of driving while intoxicated if the person is intoxicated while operating a motor vehicle in a public place. TEX. PENAL CODE ANN. § 49.04(a) (West 2012). The term "intoxicated" means (1) not having the normal use of mental and physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of those substances, or any substance into the body, or (2) having an alcohol

concentration of 0.08 or more. *Id*. § 49.01(2)(A)–(B) (West 2011). Thus, section 49.01(2) provides two alternative methods for the state to prove intoxication. These are referred to as the impairment theory (loss of normal use of physical or mental faculties) or the per se theory (alcohol concentration of .08 or more). *See Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. Crim. App. 2010). The impairment theory of intoxication is at issue here.

Intoxication is statutorily defined. *Ouellette v. State*, 353 S.W.3d 868, 869 (Tex. Crim. App. 2011). There are six possible definitions of intoxication. They are not mutually exclusive but rather overlap. They include alcohol, a controlled substance, a drug, a dangerous drug, a combination of those substances, or any substance. TEX. PENAL CODE ANN. § 49.01(2)(A).

While the specific substance is not an element of the offense, it is an evidentiary matter which may be proved by circumstantial evidence. *Gray v. State*, 152 S.W.3d 125, 132 (Tex. Crim. App. 2004). The State is required to prove appellant did not have the normal use of his mental or physical faculties "by reason of the introduction" of alcohol, a controlled substance, a drug, a dangerous drug, a combination of those substances, or any substance. *See* TEX. PENAL CODE ANN. § 49.01(2)(A); *Kuciemba v. State*, 301 S.W.3d 460, 462 (Tex. Crim. App. 2010).

Most of the reported DWI decisions involve evidence of alcohol with and without "drugs."[1] Some cases involve only "drugs." *Delane* is one such case and is instructive. *See Delane v. State*, 369 S.W.3d 412, 418 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). In *Delane*, the defendant was observed driving dangerously (running a stop sign, almost striking another car, and hitting a curb). The defendant had no odor of alcohol on his person so the officer concluded intoxication was due to ingestion of some type of drug. *Id.* The defendant's pupils showed signs consistent with intoxication by a drug. He had trouble standing and following

---

[1] We use the term "drugs" in the generic sense to include controlled substances, a drug, a dangerous drug, a combination of these drugs, or any substance.

directions. Two prescription medications were in the defendant's car and he had taken them before driving. The defendant told an officer he was not supposed to drive while on medication. *Id*. He testified that after taking his medications he noticed that he was lightheaded and dizzy as he began driving from his house and the dizziness came out of nowhere. On videotape he said that he was under the influence of his medication and that it was making him drowsy. *Id.* One of his prescription bottles contained a warning label cautioning against driving. The court concluded the driving facts, the sobriety tests, the defendant's admissions, and the evidence about drug usage proved "intoxication." *Id.*

In the case at bar, the evidence shows appellant did not have the normal use of his mental or physical faculties. Appellant was observed driving in a circle in a field late at night. His turn signal and windshield wipers were on, and it was not raining. When the officers first made contact with appellant, he appeared disoriented and confused. Both officers testified that appellant did not have normal use of his physical and mental faculties. Officer Larue testified that appellant performed poorly on the field sobriety tests. She observed six clues of intoxication on both the HGN test and the walk and turn test, and three clues of intoxication on the one-leg stand test. Appellant told the officers "a guy" had instructed him to go into the field, but there was no one else present. Appellant was unable to follow instructions, as evidenced by the field sobriety tests, and his failure to turn off his windshield wipers when told to do so. When asked the date, appellant provided a date twelve days in the future from the actual date. Appellant appeared to be unaware of where he was, and the officers became concerned that he had mental health issues. The officer also observed that appellant's balance and speech were impaired, and formed the opinion that appellant was "on something."[2] Notwithstanding medical records stating

---

[2] The videotape of the officers' roadside encounter with appellant, which includes his performance on the field sobriety tests, was admitted into evidence for the court to view.

a family member picked appellant up at the hospital, appellant claimed he drove himself to and from the hospital. He was unable to explain what happened from the time he left the hospital until the officers stopped him in a field early the next morning. Thus, appellant was unable to account for over five hours.

Further, the evidence shows "a controlled substance, a drug, a dangerous drug, a combination of those substances, or any substance" caused appellant to not have the normal use of his mental or physical faculties. Appellant had taken a drug or combination of drugs. Appellant admitted to taking numerous prescription drugs. These drugs had potential side effects of dizziness and inability to operate vehicles. Appellant's expert, a psychologist and R.N., admitted the drugs could have an effect on some people, and she had no personal knowledge of whether any of appellant's prescription medications affected him in this manner.

Appellant was in the hospital the night before he was stopped and was given morphine and a muscle relaxant in addition to the prescription medication appellant was taking. Appellant was wearing his hospital bracelet when he was stopped and did not know where he had been since his discharge from the hospital hours before. The hospital discharge papers listed the medications that had been prescribed. The medications included a pain medicine and a muscle relaxant, and both carried warnings about driving a vehicle or operating heavy machinery. The warnings also indicated that the medications could cause drowsiness when taken in combination with each other and other medications. Finally, when describing the field sobriety tests, the officer stated HGN is generally caused by alcohol or narcotics.

We conclude that, based on the driving facts, the sobriety tests, the officers' evaluation and opinion of appellant's performance and condition, appellant's admissions, the substantial period of time preceding appellant's arrest for which appellant had no apparent memory, appellant's use of prescription medication, and the morphine dosage recently administered at the

Rockwall hospital, the trial court could reasonably find that appellant did not have normal use of his mental or physical faculties resulting from the introduction of a drug or combination of drugs. *See Landers v. State*, 110 S.W.3d 617, 620–21 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (finding evidence sufficient to support DWI when appellant admitted ingesting medication and appeared sluggish, stumbled, had poor coordination, and slurred words); *Harkins v. State*, 268 S.W.3d 740, 748 (Tex. App.—Fort Worth 2008, pet. ref'd) (holding evidence of intoxication sufficient based on officer testimony that appellant's eyes were heavy, her pupils constricted, and she was disoriented and slurred her speech); *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (concluding evidence supported intoxication where defendant admitted taking Xanax the night before and Vicodin intermittently, trooper observed erratic driving, slurred speech, unstable gait and dilated pupils, trooper believed defendant was under influence of narcotic, hospital recorded that defendant appeared to be intoxicated by opiates, and expert testified that defendant's prescription drugs could impair cognitive ability and central nervous system); *Paschall v. State*, 285 S.W.3d 166, 177–78 (Tex. App.—Fort Worth 2009, pet. ref'd) (holding evidence sufficient to find intoxication based on video of field sobriety tests admitted into evidence, witnesses' observations of erratic driving, defendant's poor performance on field sobriety tests, officer testimony that HGN is accurate measure of intoxication, pharmacist testimony that drugs taken by defendant could cause slurred speech, affected balance, abnormal gait, and constricted pupils and officer's observation of these symptoms in defendant).

Although appellant presented an alternative explanation for his condition, it was the trial court's function in its role as fact finder to resolve any conflicts in the evidence, and the judge was free to accept or reject any and all of the evidence presented by either side. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim.

App. 2000). Therefore, we conclude the evidence was sufficient to establish the element of intoxication.

Appellant also argues the evidence is insufficient to establish that he was in a "public place." A "public place" is defined as "any place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, apartment houses, office buildings, transport facilities, and shops." TEX. PENAL CODE ANN. § 1.07(40) (West Supp. 2013); *Loera v. State*, 14 S.W.3d 464, 467 (Tex. App.—Dallas 2000, no pet.) (stating that pertinent question is "whether the place is one to which the public has access"); *see also Woodruff v. State*, 899 S.W.2d 443, 445 (Tex. App.—Austin 1995, pet. ref'd). The penal code does not define access, but appellate courts have defined it as: "freedom of approach or communication; or the means, power, or opportunity of approaching, communicating, passing to and from." *Loera*, 14 S.W.3d at 467.

Courts have concluded that a parking lot is a public place for purposes of section 49.04(a) when the evidence shows that the public had access to it. For example, the San Antonio Court of Appeals has held that a parking lot that was meant for patrons of a nightclub was a public place because the public had clear access to it. *Kapuscinski v. State*, 878 S.W.2d 248, 250 (Tex. App.—San Antonio 1994, pet. ref'd); *see also State v. Nailor*, 949 S.W.2d 357 (Tex. App.—San Antonio 1997, no pet.) (hotel parking lot a public place). Likewise, a parking and sidewalk area outside a gas station is considered a public place. *See York v. State*, 342 S.W.3d 528, 537 (Tex. Crim. App. 2011).

Appellant complains that there were no markings in the parking lot to indicate that it was public, and the officer admitted that she did not know if the gravel road was public or private. Appellant also points out that neither officer saw appellant on Highway 205; they saw him only on the gravel road leading to the highway. (We observe appellant has not explained how he

could possibly have driven from a hospital in Rockwall to the field where he was arrested in Collin County without traveling on a public road.)

Both officers testified that appellant was operating a vehicle in a public place and that the public had access to both the parking lot and the gravel road. There is nothing in the record to suggest that either location was private or not otherwise open to the public. There were commercial vehicles parked in the parking lot. The gravel road leads to a highway. From this evidence, the court could reasonably conclude that the public had access to both areas. *See Loera*, 14 S.W.3d at 467. Accordingly, the evidence is sufficient to support the "public place" element of driving while intoxicated. Appellant's fourth and fifth issues are overruled.

### *Illegal Search and Seizure*

In his first and third issues, appellant asserts the trial court erred in admitting State's Exhibits 3 and 4 because they were obtained through a warrantless search and seizure in violation of the Fourth Amendment.

To preserve error for appellate review, the rules of appellate procedure require that the record show that the objection "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). The objection must be specific so that the trial court is aware of the complaint and has the opportunity to correct the error, or the opposing party has an opportunity to remove the basis for objection. *Martinez v. State*, 22 S.W.3d 504, 507 (Tex. Crim. App. 2000). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004). Even a constitutional error can be forfeited if an objection is not made at trial. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009);

*Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990). The point of error on appeal must also comport with the objection made at trial; otherwise, the issue has not been preserved for our review. *See Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986)

State's Exhibit 3 consists of three pages of discharge instructions appellant received upon discharge from the hospital the day before his arrest. Exhibit 4 is a copy of appellant's hospital records with an affidavit from the custodian of records. When the State offered Exhibit 3, appellant's counsel lodged a hearsay objection which the trial court overruled. When the State offered Exhibit 4, appellant's counsel objected that he did not have two weeks to review the documents as required by TEX. R. EVID. 902(10). The court noted the affidavit from the custodian of records had been on file for the appropriate amount of time and overruled the objection.

Appellant's counsel did not object to Exhibit 3 or 4 on Fourth Amendment grounds at any time during trial, and there are no pre- or post-trial motions asserting the documents were obtained through an illegal search and seizure or that one or more of the documents are fruit of the poisonous tree.[3] Because appellant's appellate points do not comport with his trial objections, the issues have not been preserved for our review. Appellant's first and third issues are overruled.

### *Authentication of Evidence*

In his second issue, appellant complains that the trial court erred in admitting Exhibit 3, the discharge summary, "without authentication or sponsor." Appellant claims the State improperly used the Exhibit to show he had just been released from the hospital and had been

---

[3] Appellant's fruit of the poisonous tree argument is less than clear. Appellant argues that "Exhibit 3 . . . was secured by legal means, but discovered as a result of the improper search securing State's **Exhibit 2**. Therefore, State's Exhibit 3 is fruit of the poisonous tree." (Emphasis added). Because there was no trial objection concerning any constitutionally illicit conduct, we need not address whether any exhibit was fruit of the poisonous tree.

–13–

prescribed a number of medications. Although appellant objected to the exhibit when it was first offered into evidence, he did not ask for a running objection. Thereafter, when witnesses testified about the exhibit and its contents, appellant did not object. For example, Officer White testified without objection that appellant identified Exhibit 3 as his discharge papers. Officer Larue testified without objection that appellant identified Exhibit 3, and the document reflected that appellant had been prescribed medications that carried a warning about driving or operating heavy machinery. Moreover, appellant's expert witness presented the same evidence—details of his treatment at the hospital and prescription medication. Because the same evidence was admitted without objection, any error concerning the admission of Exhibit 3 was waived. *See Jefferson v. State*, 909 S.W.2d 247, 250 (Tex. App.—Texarkana 1995, pet. ref'd). Appellant's second issue is overruled.

Having resolved all of appellant's issues against him, we affirm the trial court's judgment.

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE

Publish
TEX. R. APP. P. 47
120863F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

LAWRENCE FRANK CROUSE, Appellant

No. 05-12-00863-CR   V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 2, Collin County, Texas
Trial Court Cause No. 002-87861-2011.
Opinion delivered by Justice FitzGerald.
Justices Francis and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered March 27, 2014

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE