PD-1406-15

PD-1406-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 10/29/2015 4:53:34 PM
Accepted 11/2/2015 11:38:39 AM
ABEL ACOSTA
CLERK

NO. _____

## TEXAS COURT OF CRIMINAL APPEALS
## AUSTIN, TEXAS

### TERRI COX FERGUSON, APPELLANT

### V.

### THE STATE OF TEXAS, APPELLEE

### NO. 01-14-00247-CR
### IN THE COURT OF APPEALS
### FOR THE FIRST DISTRICT OF TEXAS
### HOUSTON, TEXAS

### TRIAL COURT NUMBER 1330035
### IN THE 174TH DISTRICT COURT
### HARRIS COUNTY, TEXAS

---

### PETITION FOR DISCRETIONARY REVIEW

---

DAVID MITCHAM
TBA NO. 14205300
405 MAIN STREET, SUITE 401
HOUSTON, TEXAS 77002
TEL.: 713.222.1616
FAX NO.: 713.222.6262
mitchamlaw@att.net

FILED IN
COURT OF CRIMINAL APPEALS

November 2, 2015

ATTORNEY FOR APPELLANT

ABEL ACOSTA, CLERK

1

## IDENITY OF JUDGE, PARTIES AND COUNSEL

Appellant: **Terri Cox Ferguson**

Counsel for the Appellant:

> **David Mitcham** — Trial and on appeal
> 1314 Texas Avenue, Suite 1314
> Houston, Texas 77002
>
> **Doug O'Brien** — Trial and on appeal
> JP Morgan Chase Building
> 712 Main, Suite 1800
> Houston, Texas 77220
>
> **Linda Mazzagatti** — Trial and on appeal
> 6750 West Loop South, Suite 235
> Bellaire, Texas 7401-4123

Appellee: **The State of Texas**

Counsel for Appellee:

> **Daniel Werlinger** — Counsel at trial
> **Alison Baimbridge** — Counsel at trial
> **Britni Cooper** — Counsel at trial
> **Alan Curry** — Counsel on appeal
> Assistant District Attorneys
> Harris County Criminal Justice Center
> 1201 Franklin Street, Suite 600
> Houston, Texas 77002

Trial Judges:

> **Hon. Jay Burnett** — Presiding Judge
> **Hon. Ruben Guerrero** — Presiding Judge

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is REQUESTED since this is a case that contains an issue which has not been resolved by this Court.

2

# SUBJECT INDEX

Page

PETITION FOR DISCRETIONARY REVIEW ........................................................ 1

IDENITY OF JUDGE, PARTIES AND COUNSEL ................................................ 2

STATEMENT REGARDING ORAL ARGUMENT ...............................................2

SUBJECT INDEX............................................................................................3

LIST OF AUTHORITIES.....................................................................................4

STATEMENT OF THE CASE................................................................................ 5

STATEMENT OF THE PROCEDURAL HISTORY ............................................. 5

GROUND FOR REVIEW ..................................................................................... 5


**THE COURT OF APPEALS ERRED IN FINDING THAT THE
EVIDENCE WAS SUFFICIENT, AS TO THE ELEMENT OF
INTOXICATION, TO SUPPORT THE CONVICTION**


ARGUMENT ...................................................................................... 5-13

PRAYER FOR RELIEF.................................................................... 13

CERTIFICATE OF SERVICE ........................................................... 14

CERTIFICATE OF COMPLIANCE ................................................... 14

APPENDIX-COPY OF OPINION ...................................................... 15-33

# LIST OF AUTHORITIES

_Page(s)_

## FEDERAL CASES

*In re Winship*, 397 U.S. 358 (1970)..................................................................6

*Jackson v. Virginia*, 99 S Ct. 2781(1979) ...............................................6, 13

## STATE CASES

*Adames v. State*, 353 S.W.3d 854 (Tex. Crim. App. 2011) ........................6

*Hernandez v. State*, 107 S.W.3d 41 (Tex. App.- San Antonio, 2003, pet. Ref'd)................7

*Smithhart v. State*, 503 S.W.2d 283 (Tex.Crim.App.1973) .........................8

TO THE COURT OF CRIMINAL APPEALS OF TEXAS:

Comes now, TERRI COX FERGUSON, appellant, and files this petition for discretionary review.

## STATEMENT OF THE CASE

Appellant, upon her plea of not guilty, was found guilty by a jury of the offense of murder. (C.R. 702-703) Punishment was assessed by the Court at fifteen years confinement. (C.R. 702-703) Written notice of appeal was timely filed by the appellant (C.R. 705-706) and the trial court entered the certification of the defendant's right of appeal. (C.R. 707) A timely motion for new trial was filed by the appellant and was overruled by operation of law. (C.R. 711-715)

## STATEMENT OF PROCEDURAL HISTORY

On July 9, 2015, the First Court of Appeals affirmed the conviction. On July 23, 2015 a motion for rehearing was filed and was denied by the Court on October 1, 2015.

## GROUND FOR REVIEW

**THE COURT OF APPEALS ERRED IN FINDING THAT THE EVIDENCE WAS SUFFICIENT, AS TO THE ELEMENT OF INTOXICATION, TO SUPPORT THE CONVICTION.**

## ARGUMENT

The court of appeals has decided an important question of state law and federal law that has not been, but should be, settled by the Court of Criminal Appeals.

5

The Court of Appeals erred in holding that the evidence is sufficient to establish that the appellant was intoxicated by not having the normal use of her mental and physical faculties by reason of the introduction of a controlled substance, a drug, a dangerous drug, a combination of those substances, or any substance into her body.

The Court reviewed the evidence using the *Jackson* standard of review. "When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence)." (Op. 3) However, under this standard, evidence is insufficient to support a conviction if considering all record evidence in the light most favorable to the verdict, a factfinder could not have rationally found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *In re Winship*, 397 U.S. 358, 361, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Evidence is insufficient under this standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the acts alleged do not constitute the criminal offense charged. *See Jackson*, 443 U.S. at 314, 318 n. 11, 320, 99 S.Ct. 2781.

The evidence fails to show that appellant did not have the normal use of her mental or physical faculties as a result of any substance. No officer testified that

6

appellant did not have the normal use of her physical and mental faculties. Further, no evidence shows "a controlled substance, a drug, a dangerous drug, a combination of those substances, or any substance" caused appellant to not have the normal use of her mental or physical faculties.

The evidence and testimony in the instant case is devoid of expert testimony as found in various other cases to reasonably find that appellant did not have normal use of her mental or physical faculties resulting from the introduction of a drug or combination of drugs.

"While intoxicated" is the contested element, but the reason for not having the normal use is important and necessary since, by definition, one cannot be found to be intoxicated if he lacks the normal use of mental or physical faculties for a different reason, such as disability, illness, fatigue, stress, or seizures. An individual can only be found intoxicated by reason of the introduction of a substance into the body. *Hernandez v. State*, 107 S.W.3d 41 (Tex. App.- San Antonio, 2003, pet. Ref'd)

In the present case, none of the investigating officers smelled alcohol, nor did they find any alcohol, or suspect alcohol as the reason for not having the normal use of mental or physical faculties.

After being arrested, appellant was asked and agreed to submit the draw of a blood sample at Memorial Hermann Southeast Hospital. (R.R. III. 149-160) The blood test was negative for alcohol. Furthermore, none of the toxicology experts presented by the State could say with any reasonable degree of medical certainty that the medications and marijuana in the appellant's blood alone or together caused loss of the normal use of her mental or physical faculties.

Alcohol intoxication is a common occurrence and requires no expertise, but the rule as to whether a person is under the influence of drugs is different. *Smithhart v. State*, 503 S.W.2d 283 (Tex.Crim.App.1973). *Smithhart* was charged with operating a vehicle while under the influence of drugs to the degree, which renders the driver incapable of safely operating a vehicle. In *Smithhart*, the police officer testified to many symptoms of possible intoxication: incoherent speech, glassy eyes, admission of recent ingestion of valium and drinking vodka earlier, and an accident, but unable to connect the symptoms to the reason for not having the normal use of faculties since the officer was not qualified to give an opinion as to drugs.

A person waking up from a seizure might experience fatigue, confusion, and difficulty with gross motor skills such as walking, dilated pupils, flushing, retrograde amnesia, and thick-tongued speech. Appellant coming out of a seizure, which can mimic intoxication, could have caused the symptoms observed by the officers.

The first person to come into direct contact with the appellant following the accident was Deputy Michael White who stated she was unresponsive to his requests to get out of the car, very incoherent in a daze, had "foam" coming out of her mouth and was shaking (R.R. III. 84-86, 102-103)

Stephen Bynum observed the appellant just before Deputy White and stated that the appellant was either drunk or having a seizure. (R.R. VI. 84-85). He stated that when he looked at her face she did not appear to be drunk but was having some type of episode. (R.R. VI. 88)

Sergeant Robert Francis conducted field sobriety tests on the appellant. The first test he administered was the Horizontal Gaze Nystagmus Test. The first thing he noticed was that she had unequal pupil size. (R.R. IV. 33) He asked her if she had a recent head injury and she stated that her dog had knocked her down and she

8

injured her head. He did not detect any odors of alcohol. He was not able to complete the HGN test because of the unequal pupil size. However, he stated that no nystagmus was present. (R.R. IV. 34) The appellant was unable to perform the walk and turn test as well as the one leg stand because of prior injuries. (R.R. IV. 57-59). He also had her perform the Rhomberg Test and detected a sway and she estimated 30 seconds as 20 seconds. (R.R. IV. 59) She had issues doing the alphabet test but was able to do a hand dexterity test. (R.R. IV. 61) Since Sergeant Francis was not currently certified as a Drug Recognition Expert he was not allow to opine as to whether the appellant was intoxicated. He stated that he did not smell any marijuana in the appellant's vehicle, on her breath or on her person. (R.R. IV. 125-126)

Deputy James Stanley read the appellant her warnings and took her to the hospital to obtain a blood draw and expressed no opinion as to whether she was intoxicated or any signs of intoxication. (R.R. IV.  143-151)

Dr. Walterscheid related the drugs reflected in the lab analysis report to include no alcohol but clonazepam, 7 – aminoclonazepam, temazepam, carisoprodol, meprobamate, delta-9– tetrahydrocannabinol and nor–carboxy–tetrahydrocannabinol. (R.R. V. 120-121)  At the conclusion of his testimony he answered that he could not testify with any reasonable, reliable scientific basis for determining based upon his reading of the toxicology report and the evidence before the court that the appellant was intoxicated at the time in question on September 29, 2011. (R.R. V. 139)

Dr. Plunkett stated that based upon the State's toxicology reports an opinion could not be given that appellant was intoxicated or impaired. (R.R. VI. 129) She stated that the lab report reflected low levels of each of the drugs reflected in the

9

report (R.R. VII. 118-125) and that the report did not reflect amounts consistent with someone who had taken 10 somas. (R.R. VII. 124)

Nu Lienko stated that somewhere between 4 and 5 o'clock, the appellant came in and picked up an order to go. She sounded normal when she ordered the sandwiches over the phone and appeared normal when she picked up the sandwiches. (R.R. VI. 14-21)

Dr. Irwin S. Novak stated a seizure is an electrical disorder of the brain. The patient may be confused, may stare, be disoriented and may be able to do some motor activities. They are unaware of their surroundings and have slurred speech, shaking, salivation and foaming at the mouth. (R.R. VII. 47) They can continue to drive a car but they would drive it erratically. (R.R. VII. 47) From reading the description of the appellant at the scene and the police reports, DVD's of the appellant and witness statements he was able to determine that it was consistent with a seizure. (R.R. VII. 49)

Dr. Novak stated that he has performed thousands of Horizontal Gaze Nystagmus tests and that if a patient had unequal pupil sizes it would be consistent with someone who had just had a seizure. (R.R. VII. 51) The person should be taken to a hospital because they would be in a postictal state and may be disoriented, confused, unsteady, have slurred speech, be befuddled and may try to fill in details but their memory is faulty. (R.R. VII. 52) They will not remember that they had a seizure and will not remember events that occurred during the postictal state. (R.R. VII. 53) Following a seizure it could take from minutes to days before their memory kicks back in. (R.R. VII. 54) A person in the state of seizure is not capable of a conscious act. If they are driving a car they cannot keep a proper lookout, control

10

their speed properly, maintain a single lane of traffic or avoid collision with persons or property. (R.R. VII. 53-54)

The fact that the appellant had no nystagmus was significant because patients have nystagmus when they are taking medications such as benzodiazepines and non-benzodiazepines in high levels. Anisocoria or unequal pupils would not be seen. The unequal pupil sizes would indicate another medical condition such as seizures had occurred. (R.R. VII. 56) When appellant was examined and determined to have unequal pupil sizes she should have been taken to the hospital and been evaluated. (R.R. VII. 57)

From Dr. Novak's review of the DVD reflecting the interrogation by the police officers she appeared to be inconsistent and disoriented and a person who has had a seizure is unaware that the seizure occurred. (R.R. VII. 57-58) The first seizure while driving occurs frequently and is possibly unrecognized. They have seizures -- these are paroxysmal episodic events that can occur anywhere under any circumstances whether they're awake or asleep, but the first seizure while driving is a clinically recognize event and possibly under recognized. (R.R. VII. 60)

Dr. Novak conducted a medical examination of appellant beginning on September 13, 2013, which included an EKG, electrocardiogram, an EEG, electroencephalogram, a 72 -- hour EEG with video and ambulatory monitoring, brain MRI, magnetic resonance scan imaging, chest X-ray, and urinalysis.

He also reviewed medical records for the Houston Methodist Hospital's emergency room for September 25, 2013. The medical records reflected that she had had a seizure. (R.R. VII. 62-63) The EMS records of the incident noted, and an M.D. was present, that there were multiple episodes of peti mal, which probably reflect complex partial seizures. (R.R. VII. 63) Additionally the EEG that was recorded

11

revealed findings that were consistent with diffused disturbance of brain function and focal potentially epileptogenic lesions. (R.R. VII. 64-65) Appellant had a interictal abnormality that in her case was right and left, the frontal and central areas of the brain which is consistent with a seizure but no actual seizures that were ongoing at the time of the 72- hour monitors. Normal healthy patients do not have interictal activity. They have normal EEG's and do not have spikes and they don't have sharp waves or spikes in waves. (R.R. VII. 65) Seizures are episodic paroxysmal events that occur out of the background, out of the blue. (R.R. VII. 66-67)

Dr. Novak also reviewed the records of appellant being admitted to St. Luke's Hospital at The Vintage on January 21, 2014. When she was admitted she had an altered mental status, probable seizure and possible pseudo seizure. Pseudo seizures are unconscious seizures. They have no abnormality in electrical activity. They occur less often than regular seizures and there's no abnormality in the EEG. The patients are unconscious of what happens. It's a subconscious disorder and falls into psychiatric dysfunction and what they call disassociated state. (R.R. VII. 70-71) At St. Luke's the appellant was intubated after sedation and admitted on a respirator. (R.R. VII. 71)

In-reference to partial complex seizures it is possible that a person could be on the beltway and go into a seizure and continue to drive. (R.R. VII. 74) The description of the appellant that was reflected in the offense report would be consistent with a tonic seizure. (R.R. VII. 102) The only time unequal pupil size are the result of drugs is if the drugs were put in the eye. (R.R. VII. 103)

12

The symptoms of unequal pupils, no nystagmus in the eyes, responsive to light, foaming at the mouth, nonresponsive to questions, and shaking uncontrollably are consistent with a seizure. (R.R. VII. 128)

Facts supporting an essential element, "reason for not having the normal use", were not proved and a rational trier of fact could not have found beyond a reasonable doubt the essential element that the appellant did not have normal use of her mental faculties by reason of the introduction of alcohol, a controlled substance, a drug, or a dangerous drug into the body, or a combination of two or more of these substances into the body. Even viewing the evidence in the light most favorable to the verdict, no rational trier of fact could have found the essential element of "intoxication" of the crime of driving while intoxicated beyond a reasonable doubt. *Jackson v. Virginia*, 99 S.Ct. 2781 (1979)

## PRAYER FOR RELIEF

Appellee prays that the Court grant this petition and order the filing of briefs.

Respectfully submitted,

*David Mitcham*

**DAVID MITCHAM**
**TBA NO. 14205300**
**405 MAIN STREET, SUITE 401**
**HOUSTON, TEXAS 77002**
**TEL.: 713.222.1616**
**FAX NO.: 713.222.6262**
**mitchamlaw@att.net**

**ATTORNEY FOR APPELLANT**

13

## CERTIFICATE OF SERVICE

I, DAVID MITCHAM hereby certify that a true and correct copy of Appellant's Petition for Discretionary review was mailed to the attorney for the State and the State Prosecuting Attorney on this the 29th day of October, 2015.

## CERTIFICATE OF COMPLIANCE

This is to certify that the foregoing instrument has a total of 2807 words.

David Mitcham



In The

# Court of Appeals

For The

# First District of Texas

---

## NO. 01-14-00247-CR

---

**TERRI COX FERGUSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case No. 1330035**

---

## MEMORANDUM OPINION

In a single point of error, appellant Terri Cox Ferguson challenges the sufficiency of the evidence to support her conviction for the offense of felony murder. We affirm.

## BACKGROUND

On September 29, 2011, Gabriela Rodriguez was standing in the emergency lane of Beltway 8 putting gasoline in her vehicle when appellant swerved her vehicle onto the shoulder, striking and killing Rodriguez. Appellant was charged with felony murder predicated on causing Rodriguez's death while committing the offense of driving while intoxicated as a third offender.

At trial, the State argued that appellant was intoxicated as the result of mixing consumption of numerous prescription medications and marihuana. Appellant argued that she was not intoxicated and that instead she had suffered a seizure that rendered her actions involuntary. The jury found appellant guilty of felony murder, and the trial court sentenced her to fifteen years' confinement.

## INTOXICATION

The jury was properly charged with the Penal Code definition of "Intoxication":

> (2) "Intoxicated" means:
>
> (A) not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body; or
>
> (B) having an alcohol concentration of 0.08 or more.

TEX. PENAL CODE ANN. § 49.01 (West 2011). Under this section, "intoxication may be proven in either of two ways: (1) loss of normal use of mental or physical

2

faculties or (2) alcohol concentration in the blood, breath, or urine of 0.08 or more." *Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. Crim. App. 2010). "The first definition is the "impairment" theory, while the second is the "per se" theory." *Id.*

The identity of the particular substance causing the intoxication is not an element of the offense. *Gray v. State*, 152 S.W.3d 125, 132 (Tex. Crim. App. 2004). And an intoxication finding may be supported entirely by circumstantial evidence. *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010).

## STANDARD OF REVIEW

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). A jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson v. State*,

3

29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted).

We afford almost complete deference to the jury's credibility determinations. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination."). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011) (quoting *Clayton*, 235 S.W.3d at 778). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

## ANALYSIS

### A. Trial Testimony about Appellant's Actions on September 29, 2011

Several witnesses testified to their observations of appellant's driving and behavior around the time appellant struck Rodriguez with her vehicle. Charlie Holly testified to first spotting appellant's vehicle about 5:00 p.m. on September

4

29, 2011 while driving on Interstate 45 on his way home from work. He was in the far right-hand lane preparing to take the exit to Beltway 8 when he "looked up to the ramp going up onto the beltway and observed a lot of cars were backing up." This was because appellant's black SUV was driving slowly, causing a back-up behind it. Holly testified that appellant was driving so slowly that he assumed that she was having vehicle trouble.

As he merged onto Beltway 8, Holly also spotted a white SUV on the right-hand shoulder of the freeway. Rodriguez was putting gas in that white SUV. Holly testified to seeing appellant's SUV move into the emergency lane behind Rodriguez's stopped vehicle, and he assumed that appellant was stopping to assist Rodriguez. Instead, appellant began swerving back into the main lanes of Beltway 8, striking Rodriguez's body and throwing her into the air. Holly testified that appellant continued driving another 40 or 50 yards, and then moved over onto the shoulder and stopped. Holly stopped and called 911.

Gretchen Janecek also testified to driving behind appellant as she exited Interstate 45 and merged onto Interstate 10. Janecek saw appellant's vehicle repeatedly swerve between lanes such that Janecek was concerned it would collide with another car. Janecek saw appellant strike Rodriguez.

Essence Bukem also testified to driving behind appellant and purposely staying back "a little bit" because appellant's vehicle was fishtailing. Bukem saw

appellant swerve onto the shoulder lane, strike Rodriguez, and then speed up. Bukem starting honking at appellant to get her attention while she called 911. Buken continued to follow appellant for about 10 or 15 minutes while Buken's passenger stayed on the phone to keep a police dispatcher apprised of appellant's location.

Deputy M. White with the Harris County Constable's office was dispatched. White spotted appellant driving as he got onto Beltway 8 about 17 miles from the accident scene. She was "swerving, unable to maintain her lane." She did not immediately pull over when White activated his lights and sirens. She eventually pulled over, striking a barrier as she did so.

White testified that appellant had little reaction to anything he said. She did not respond when he asked her to put her vehicle in park, turn the vehicle off, and step out of the vehicle. Thus, White reached in, put appellant's vehicle into park, turned off the ignition, and helped appellant out of the vehicle. He described her as "very incoherent" and "just in a daze." Appellant also had a lot of saliva collected at the sides of her mouth. From his interactions with her, White surmised from his knowledge and experience that appellant was under the influence of something. From his experience, he did not see any signs of a medical problem or condition.

6

Pursuant to instructions from his Sergeant, White called a wrecker to take appellant's vehicle back to the accident scene. White also drove appellant there and then turned appellant over to Deputy Stanley.

Officer Robert Francis was dispatched to the scene to investigate. He testified that he first encountered appellant about 1 or 1 1/2 hours after the accident when she was brought back to the scene. Francis described appellant as appearing confused, exhibiting slurred speech, and unsteady on her feet. He opined that she appeared "as an intoxicated person would appear." Francis performed field sobriety tests, although he did not detect the odor of alcohol on her breath.

Francis first planned to perform a Horizontal Gaze Nystagmus Test (HGN), which is designed to detect nystagmus (i.e., involuntary jerking of the eyeballs). He noticed her pupils were different sizes, however, and inquired whether she had a recent head injury. Appellant responded that her dog had recently knocked her down. He continued with the test even though he knew that the unequal pupil size and possible head injury would invalidate any HGN results. He did not detect any nystagmus. Francis testified that result did not surprise him, because not all intoxicating substances cause nystagmus.

Francis next planned to complete a Walk-and-Turn Test on appellant. Appellant, however, claimed that she had an injured knee from either falling down stairs or her dog knocking her down that prevented her from completing that test.

7

Francis next attempted to administer the One-Leg-Stand Test. When appellant again claimed injury, Francis asked if she could lift her injured leg and stand on her good leg. Appellant responded that she did not think she could do that.

Francis then administered the Rhomberg Balance Test, which required appellant to tilt her head back slightly, close her eyes, and approximate the passage of 30 seconds. She exhibited eyelid tremors (which are an indication of consumption of drugs), swaying (which indicates impairment), and an inability to accurately estimate the passage of time (which can indicate a subject is under the influence).

Next Francis asked appellant to recite the alphabet from A to Z. She had a difficult time, stumbled around, and was unable to finish. Her speech was also noticeably slurred.

Finally, Francis administered the Dexterity Test, which requires "touching your thumb to your fingers and counting in sequence forwards and then backwards." Appellant was able to complete that task, and in fact started performing that test before Francis gave her the instructions.

Francis then asked appellant several questions that he believed she understood. He asked her what she was doing, and she said she was taking food to a friend in the area of Monroe Road off of Interstate 45. She told him that she

believed that the accident happened on Interstate 45 (rather than Beltway 8, where it actually occurred). She also told Francis that earlier that same day she had forgotten to open her garage door and struck the door while backing out. Finally, she told Francis that she had a 500-acre ranch and the damage on the front of her vehicle resulted from her hitting a tree on that ranch. Francis opined that there was no damage to the vehicle consistent with a tree strike.

Deputy James Stanley with the Harris County Constable's Office testified that he was dispatched to the scene of the hit-and-run. After appellant was brought back to the scene, Stanley was instructed to give her statutory warnings and take her to the hospital for a blood draw. He did so, and then returned with her to scene so that Francis could conduct the field sobriety testing described in Francis's testimony. After Francis obtained consent from appellant for a blood draw, Stanley took her back to the hospital for a second blood draw.

Deputy James Meaux, an accident reconstructionist with the Harris County Sheriff's Office, testified that he reconstructed the accident by using the responding officers' offense reports, the officers' photographs from the scene, the Medical Examiner's report, the autopsy report, the autopsy photographs, and data from appellant's airbag control module. He concluded that appellant failed to control her speed around Rodriguez and that she failed to maintain a single lane of traffic by veering into the emergency shoulder lane.

9

## B. Intoxicating Substances

The jury also heard testimony about appellant's possession and ingestion of various medications. Dr. Stephen Sapsowitz testified that appellant was his patient and that he had seen her a total of five times beginning on June 7, 2011. In August 2011, at her second visit, she had recently fallen. She had an injured ankle and knee, and complained about lower back pain. Appellant reported at that visit that the anti-inflammatories she was taking for these injuries were not sufficiently helping with pain, and she requested, and received, a prescription for Soma (i.e. Carisoprodol).

Appellant also had an appointment with Sapsowitz on September 29, 2001, the day of the accident. He treated her on that day for a cold, and at that visit she asked for additional Soma. At that visit, he prescribed for her (1) antibiotics, (2) 60 pills of Soma, and (3) cough syrup with codeine.

Sapsowitz testified that appellant did not report taking any illegal drugs, including marihuana. Appellant did not disclose to Sapsowitz that she was taking quazepam or temazepam. Sapsowitz explained at trial that these other medications are benzodiazepines, which would not mix well with Soma—it would have an additive effect. He testified that he would not have prescribed Soma if he had been told that she was taking benzodiazepines. He also testified that knowledge of marihuana use would not have prevented him from prescribing Soma.

10

Sapsowitz noted Soma carries manufacturer's warning because it "can have the same effects as alcohol." It can make a patient drowsy and "[y]ou can get impaired with your ability to do things and . . . have similar effects to believed to be drunk."

Dr. James Wright, appellant's treating psychiatrist, testified that he treated appellant for Bipolar II Disorder, anxiety, and insomnia from 2007 through 2013. In 2011, Wright was prescribing appellant four medications: Seroquel XR (mood stabilizer), Lexapro (antidepressant), Clonazepam (antianxiety), and Ambien CR (sedative). Appellant had been warned that she should not drive if these medications had a sedation effect. Appellant had disclosed to Wright's office in 2007 that she had a history of abusing Soma, and that concerned him because it would not mix well with the medications he prescribed to her.

In February 2011, appellant disclosed to Wright's office that she was again using Soma. In March 2001, she said that she was no longer using Soma. In June 2011, she told Wright's office that she had been off of Soma for about one month. In August 2011, she reaffirmed to Wright's office that she had been off of Soma since May.

On September 29, 2011—the day of appellant's appointment with Sapsowitz —appellant filled her newly acquired Soma prescription at 3:45 p.m., two hours before she struck and killed Rodriguez. The instructions on the Soma prescription

11

bottle stated that appellant should take one pill, four times a day as needed. The Soma prescription bottle recovered from appellant's car after the accident contained only 50 of the 60 prescribed pills. When Officer Francis asked her about medications after the accident, appellant stated that she "took a pill that starts with C that morning for her knee and then two more pills that start with C immediately before she left her home." Marihuana was also found in appellant's purse.

The two blood draws taken in the hours after the accident reflected, in appellant's system, Carisoprodol (Soma), Delta-9-tetrahydrocannabinol, Meprobamate, Norcarboxytetrahydrocanabinol, 7-aminoclonazepam, Clonazepam, and Temazepam. Appellant's toxicology expert, Dr. Laura Plunkett, testified that the active and inactive components of marihuana in appellant's blood sample "shows that it had been smoked very recently." Plunkett also testified that there is no safe level of marihuana for operating a motor vehicle, and that combining marihuana with certain prescription drugs can lead to tragic consequences. She further opined that the levels of each substance in appellant's blood draws were "low" and that the levels in appellant's blood were not consistent with having taken 10 Soma pills.

While evidence about the substances in appellant's system were admitted in evidence and the levels of each, the trial court did not allow either the State's or

appellant's witnesses to opine about whether particular levels would indicate intoxication.

Appellant returned to Sapsowitz about a week after the accident requesting more Soma because her medication had been taken with her vehicle by the police. Sapsowitz then only gave her a prescription for ten pills because at that point (i.e., six weeks after the injury for which he was prescribing Soma), she should be treated as a chronic pain, rather than acute pain, patient. He performed a urine drug screen and asked her to come back for a full physical and psychological test. He also had her sign a controlled-substances contract in which she agreed to only utilize one doctor and one pharmacy.

When Sapsowitz received appellant's drug test results from her October 2011 screen, he discovered her urine contained two different benzodiazepines, marihuana and Carisoprodol (Soma). He had his nurse call appellant to come in to discuss the results, but she never returned to his office.

At a November 16, 2011 appointment at Wright's office, appellant told Wright's nurse practitioner that she had hurt her back and been prescribed Soma by a different doctor. She also told Wright's office about striking and killing Rodriguez with her vehicle on September 29. Appellant said that she did not remember the crash at all, and that she was participating in a 12-step program and would never take Soma again.

## C.    Appellant's Seizure theory

Appellant's theory at trial was that she may have suffered a seizure, and that the symptoms of that seizure would be consistent with those of intoxication.

Wright had no record of appellant suffering any seizure disorder except his nurse practitioner's note on July 1, 2013 stating that appellant said "she determined that she had been having seizures as far back as her accident [and] that her, as the medical record reads, new attorney had been able to obtain proof of her seizure provided by a bystander and that she also said to my nurse practitioner that she had recently been sent to an emergency room for a seizure."

Dr. Irwin Novak, a neurologist, testified for the defense. Novak explained the definition and indicators of a seizure. He testified that patients with complex partial seizures are unaware of their surroundings, are disoriented, and that seizures can be "associated with slurred speech, shaking and salivation or foaming at the mouth." They may also experience a faulty memory. It is rare for a person with a seizure to be able to drive a motor vehicle, and it would make them drive erratically. He opined that a parson in a state of a seizure is not capable of a voluntary conscious act, so they cannot keep a proper lookout, control their speed, or maintain a single lane of traffic. Studies reflect that sometimes a patient does not know they have seizures until they are involved in a traffic accident.

14

Novak further testified that unequal sized pupils would make him concerned about a potential underlying medical condition. Possible conditions include seizures, aneurysms, tumors, or eye disease.

Novak testified to having significant experience giving HGN tests, and expressed the opinion that when a patient is taking certain medications in high levels, "you see nystagmus in every single patient."

Novak examined appellant on September 13, 2013 and ordered several tests, including a EKG, electrocardiogram, EEG, electroencephalogram, MRI, x-ray and urinalysis. The EEG test requires electrodes and a monitor be worn for 72 hours. The recording are "reviewed and then a diagnostic impression is made by an epilepsy specialist."

Novak also reviewed emergency room medical records from September 25, 2013, when appellant was brought in by EMS while wearing her 72-hour EEG monitor. Novak testified that the emergency-room physician's "impression was seizure and she was discharged in stable condition."

Novak testified that the reports generated from appellant's 72-hour EEG monitors reflected "interictal activity consistent with a seizure, but no actual seizures that were ongoing at the time of the 72-hour monitors." He explained that interictal activity is not seen in healthy patients. He opined that the "it is probable" that the reports from the EEG are "consistent with seizure activity."

15

Novak also reviewed appellant's medical records from when she was again admitted to the hospital on January 21, 2014. Novak testified that she presented with "altered mental status, probable seizure, possible pseudoseizure." She was "intubated after sedation and admitted on a respirator." Novak testified that the EEG readings at that point were abnormal and could be suggestive of a seizure. On cross-examination, Novak acknowledged that appellant's treating physicians indicated that appellant's EEG results were unremarkable. Appellant's treating physician's records also indicate that appellant reported taking Xanax and Atavan, which could cause pseudoseizures. Finally, Novak acknowledged that an abnormal EEG reading could be caused by any number of things other than a seizure, including sleep disorders, migraines, head injury, or substance abuse.

D. **Parties' Arguments**

On appeal, appellant argues that the evidence was insufficient for a rational trier of fact to have found beyond a reasonable doubt that appellant did not have normal use of her mental faculties by reasons of the introduction of drugs. Appellant acknowledges that proving the identity of a particular intoxicating substance is not an element the State must prove. She contends nonetheless that the State did not introduce evidence that she did not have the normal use of her mental of physical faculties "by reason of the introduction" of drugs. She argues that cases finding sufficient evidence are distinguishable, in part because—in this

case—there was no expert testimony to the effect that she was intoxicated from the introduction of drugs.

The State responds that the jury had ample evidence from which it could have rationally found beyond a reasonable doubt that appellant was intoxicated. We agree with the State and hold that a rational factfinder could have found appellant was intoxicated while rejecting her alternative seizure theory. *Crouse v. State*, 441 S.W.3d 508, 511–12 (Tex. App.—Dallas 2014, no pet.) (holding that, although appellant presented possible seizures an alternative explanation for his condition, it was the trial court's function in its role as fact finder to resolve any conflicts in the evidence, and the judge was free to accept or reject any and all of the evidence presented by either side and conclude that appellant did not have normal use of his mental or physical faculties from the introduction of a drug). "Circumstantial evidence may prove that a person has lost the normal use of his mental or physical faculties by reason of introduction of a controlled substance or drug into his body." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The jury's finding here is supported by the evidence about appellant's erratic driving, her failure to respond when pulled over by police, her poor performance on field sobriety testing, the presence of various drugs in her blood, her failure to disclose to Dr. Sapsowitz what other medications she was

taking that were prescribed by other doctors, and the lack of any medical documentation to support the possibility of seizures until after the accident.

We overrule appellant's sole issue.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).